UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NADYA I.,[1] | Case No. 19-cv-04373-TSH |
| Plaintiff, | |
| v. | **ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| ANDREW SAUL, | Re: Dkt. Nos. 23, 25 |
| Defendant. | |

## I.    INTRODUCTION

Plaintiff Nadya I. brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of Defendant Commissioner of Social Security, Commissioner of Social Security, denying Plaintiff's claim for disability benefits.  Pending before the Court are the parties' cross-motions for summary judgment.  ECF Nos. 23 (Pl.'s Mot.), 25 (Def.'s Mot.).  Pursuant to Civil Local Rule 16-5, the motions have been submitted without oral argument.  Having reviewed the parties' positions, the Administrative Record ("AR"), and relevant legal authority, the Court hereby **GRANTS** Plaintiff's motion, **DENIES** Defendant's cross-motion, and **REMANDS** for further proceedings consistent with this order.

## II.    BACKGROUND

### A.    Age and Work Experience

Plaintiff is 54 years old.  AR 167.  She has previous work experience as a child monitor, store laborer and stock clerk.  AR 58.  She last worked in April 2015.  AR 186.

---

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

United States District Court
Northern District of California

**B.** **Medical Evidence**

**1.** **Medical Records**

In August 2013 Plaintiff was diagnosed with shoulder tendinitis and osteoarthritis of the right acromioclavicular joint.  AR 635, 701.  In April 2015, x-rays revealed mild osteolysis in the right shoulder and no significant abnormalities in the left shoulder.  AR 337-38.

In August 2015 Plaintiff saw treating psychiatrist Mohammed Hasan Daher, M.D. for routine/medication follow-up.  AR 370.  He noted the following:

> [Plaintiff] states she is doing really good with Adderall.  She feels more attentive and focused.  Saying she is able to finish art projects. Her husband comments to her that she is more attentive.  Appetite lower but she is exercising and eating more variety and better.  No side effects.  Mood is good.  No anxiety.  No [suicidal ideation].

*Id.*  Plaintiff denied medication side effects, her treatment response was good, she reported exercising and doing artwork, and her mental status evaluation was normal.  AR 372.  Dr. Daher diagnosed ADHD, inattentive type, and noted that Plaintiff was doing well on Adderall: "No side effects.  More attentive.  Will continue same dose."  AR 373.

In October 2015 Plaintiff had a medication follow-up with Dr. Daher.  AR 301-03, 410-14. She stated that she was doing well on Adderall.  AR 301, 410.  She had tried not taking it for a few days, but she "g[ot] back to being inattentive, not completing tasks."  She denied medication side effects, her treatment response was good, and she reported exercising and doing artwork.  AR 301, 411.  Her mental status evaluation was normal.  AR 302, 411-12.  Dr. Daher diagnosed ADHD, inattentive type, and again noted that Plaintiff was doing well on Adderall.  AR 303, 413.

Treatment records from Kaiser dated October 2015 through August 2016 document Plaintiff's complaints of recurrent neck, shoulder, and below-scapula pain (AR 293, 304); treatment for ADHD, inattentive type with Adderall (AR 273; 303; 370; 407; 413); diagnoses of osteoarthritis of right acromioclavicular joint, severe distal supraspinatus and infraspinatus tendinosis and hypoplastic bicipital groove per 2013 MRI (AR 298-300, 417); an April 2016 addendum to a right shoulder MRI documenting "mild widening of the right acromioclavicular joint with decreased cortical definition of the distal clavicle.  This is commonly secondary to chronic repetitive overuse injury" (AR 417-18); and continued diagnoses of chronic pain

syndrome, myofascial pain syndrome, fibromyalgia and myalgia (AR 283-84).

In November 2015 Plaintiff presented to Carla Callao, M.D. complaining of a shoulder problem. AR 298. She reported trying at-home exercises, acupuncture, and physical therapy. *Id.* Dr. Callao's impression, based on the MRI from 2013, was "[m]ild distal clavicle osteolysis, otherwise unremarkable." AR 299. On physical examination, Plaintiff was "alert, well appearing, and in no distress." *Id.* Records from Dr. Callao that month indicate diagnoses of chronic neck pain and osteoarthritis of the right acromioclavicular joint. AR 417, 420.

Over the course of November 2015 Plaintiff attended four group ear acupuncture sessions. AR 292-94. At each session, Plaintiff complained of recurrent neck pain radiating to right and left shoulder pain, with "major pain" below the scapula, stating that any weight lifting caused pain; reported trying at-home exercises, acupuncture, and physical therapy; said that Etodalac "work[ed] partially"; and that she tolerated the acupuncture well, without any adverse effects. *Id.*

In December 2015 Plaintiff sent a message to Dr. Callao, telling her that she had been taking two group acupuncture treatments every week and that this was "managing the level of pain." AR 291-92. Later that month, Plaintiff had a telephone encounter with Dr. Callao. AR 289. Plaintiff reported doing acupuncture twice a week "for neck/shoulder pains." *Id.* She complained of right hand grip strength problems and limited thumb range of motion with pain, but she "[r]efused pain clinic referral" and "refuse[d] narcotic." *Id.*

Physical therapy records dated November 2015 through July 2016 document continued physical therapy and acupuncture for "major pain  below scapula . . . any weight lifting causes pain" (AR 264-65; 276; 280-81; 291-93, 298); right hand pain (AR 289); right sided neck, upper back pain, hand/thumb/arm pain that extends to elbow, and low back pain that refers down to the knee. (AR 264-65; 276, 281-82; 285-86).

In February 2016 Plaintiff saw Tim Jun Bong Kang for "Alternative Medicine." AR 285-86. Plaintiff complained of "right sided neck, upper back pain, hand/thumb/arm pain that extend[ed] to elbow, low back pain that refer[red] down to the knee," and rated her pain level as "5-7." AR 285. Mr. Kang treated Plaintiff with two needles of acupuncture and a heat lamp, which she tolerated well with no adverse effects. *Id.*

1        February 2016 treatment records from a telephone encounter with Dr. Callao document

2    diagnoses of chronic pain syndrome, myofascial pain syndrome, fibromyalgia and myalgia, and

3    that Plaintiff complained of intermittent memory lapses, "not sleeping well due to pain," and that

4    "Etodolac works partially."  AR 283-84.

5        In March 2016 Plaintiff saw Kristen Lee Holmes for group ear acupuncture.  AR 282.

6    Plaintiff complained of recurrent neck pain radiating to right and left shoulder pain, with "major

7    pain" below the scapula, stating that any weightlifting caused pain.  *Id.*  She reported trying at-

8    home exercises, acupuncture, and physical therapy and said that Etodalac "work[ed] partially."  *Id.*

9    She tolerated the acupuncture well without any adverse effects.  *Id.*

10       Later that month, Plaintiff saw Christopher Alan Lee for group ear acupuncture.  AR 281.

11    She complained of recurrent neck pain radiating to right and left shoulder pain, with "major pain"

12    below the scapula, stating that any weightlifting caused pain.  *Id.*  She reported trying at-home

13    exercises, acupuncture, and physical therapy and said that Etodalac "work[ed] partially."  *Id.*  She

14    tolerated the acupuncture well without any adverse effects.  *Id.*

15       In April 2016 Plaintiff saw Josef Inderkum for group ear acupuncture.  AR 280.  She

16    complained of recurrent neck pain radiating to right and left shoulder pain, with "major pain"

17    below the scapula, stating that any weightlifting caused pain.  *Id.*  She reported trying at-home

18    exercises, acupuncture, and physical therapy and said that Etodalac "work[ed] partially."  *Id.*  She

19    tolerated the acupuncture well without any adverse effects.  *Id.*

20       Later that month, Plaintiff saw Rupinder Singh, M.D.  AR 1215-19.  She complained of

21    chronic pain related to myofascial pain syndrome and fibromyalgia, pain that she described as

22    "sharp, throbbing," "get[ting] worse with activity or movements" and "interfer[ing] in daily life."

23    AR 1315.  On physical examination, she was in no acute distress, she had some tenderness and

24    limited range of motion, and her manual muscle test was "5/5."  AR 1318.  Dr. Singh's plan was

25    that Plaintiff could continue with her current medications and enroll in level 2 pain classes, with a

26    referral for outside acupuncture noted.  *Id.*

27       Several days later, Plaintiff saw Mr. Kang for "Alternative Medicine."  AR 276-77.

28    Plaintiff complained of "right sided neck, upper back pain, hand/thumb/arm pain that extend[ed]

1    to elbow, low back pain that refer[red] down to the knee" and rated her pain level as "5-7."  AR

2    276.  Mr. Kang treated Plaintiff with four needles of acupuncture and a heat lamp.  AR 277.  She

3    tolerated the treatment well with no adverse effects.  *Id.*

4        In late April 2016, Plaintiff followed up with Dr. Daher.  AR 271-73.  She told him that

5    she was doing well taking Adderall daily and that it helped her "with 'focus, getting going, doing

6    things.'"  AR 271.  She reported no side effects.  *Id.*  Her treatment response was good, and she

7    reported exercising and doing artwork.  *Id.*  Her mental status evaluation was normal.  AR 271-72.

8    Dr. Daher diagnosed ADHD, inattentive type, and noted that Plaintiff was doing well on Adderall:

9    "More attentive.  No side effects.  Will continue same dose."  AR 273.

10       In July 2016 Plaintiff saw Mr. Kang for "Alternative Medicine."  AR 264-65.  Plaintiff

11   complained of "right sided neck, upper back pain, hand/thumb/arm pain that extend[ed] to elbow,

12   low back pain that refer[red] down to the knee" and rated her pain level as "5-7."  AR 264.  She

13   said that Etodalac "work[ed] partially."  *Id.*  Mr. Kang treated Plaintiff with three needles of

14   acupuncture and a heat lamp.  AR 265.  She tolerated the treatment well with no adverse effects.

15   *Id.*

16       In August 2016 Plaintiff attended physical therapy "via entry into Level 2 chronic pain

17   classes."  AR 257, 766.  The referring diagnosis was chronic pain.  *Id.*  She reported that

18   acupuncture was "very helpful for her" and that, with her daughter being a physical therapist, she

19   was familiar with what exercises she should be doing.  AR 257, 767.  Her gait was unremarkable.

20   With her right shoulder, she reported pain at the flexion point of 136 degrees and with internal

21   rotation, but her extension and external rotation were within normal limits.  Her strength was

22   assessed at "3+/5."  Plaintiff underwent therapeutic exercise and manual therapy, with a plan to

23   transition into a home exercise program.  AR 258, 767.

24       Later that month, Plaintiff completed an exertional activities questionnaire, in which she

25   reported walking with her daughter twice a week, about ½ to ¾ of a mile in about 30 minutes.  AR

26   209.  She also reported doing some shopping and driving her car for as far as 45 miles when she

27   needed to go to the doctors or acupuncture.  AR 210.

28       In October 2016 Plaintiff saw treating pain medicine specialist Preetika Kataria, M.D.  AR

1361-67.  Plaintiff told Dr. Kataria that "the acupuncture seem[ed] to be helping a lot."  AR 1361.

She reported her pain was "better since she started acupuncture"; her level 2 pain classes "helped a

lot as well, especially the relaxation techniques"; and that she was using a TENS unit,[2] "which

also help[ed] her pain."  *Id.*  On examination, her gait was coordinated and smooth; she had full

range of motion in all major joints, including full range of neck motion without difficulty; and her

strength was "5/5" throughout the upper and lower extremities.  AR 1363.  Plaintiff was open to a

multimodal approach to treatment, including support lectures/classes, physical therapy, and the

support of a psychiatrist.  AR 1364.  Per Dr. Kataria, Plaintiff would continue medications and

physical therapy.  *Id.*  Dr. Kataria also gave Plaintiff an acupuncture referral.  *Id.*

An October 2016 Chronic Pain Management Pharmacist Initial Note documents

generalized all over pain likely secondary to myofascial pain located in Plaintiff's shoulder blades,

right shoulder and upper back, with pain described as "sharp, constant, feels like stuff tight

muscle"; "the pain increases with lifting, extending sitting, extended time in same position; the

"average severity" pain level of a 7/10 and lowest pain level at 5/10; and that she was prescribed

Indomethacin, Baclofen, Meloxicam and Gabapentin.  AR 1288-89.

Records from November 2016 document that Plaintiff was only able to walk for about 15

minutes at one time and to sit at a computer for 15 minutes; that she was experiencing poor sleep,

with average pain as a 6/10 and worsening pain as a 9/10; and that she develops pain if she does

too much functional activity.  AR 1385-86, 1507.

Physical therapy records from December 2016 document Plaintiff's diagnosis of

fibromyalgia with noted "difficulty lifting and holding even light objects with her right upper

extremity," examination findings of tender anterior glenohumeral region with reduced strength

testing in the right shoulder, and that "the patient's right shoulder pain is/are causing an impaired

functional ability to lift things."  AR 1390-92; 1511-13.

On March 28, 2018, Dr. Callao saw Plaintiff.  AR 1487-89.  Dr. Callao noted her

---

[2] Transcutaneous electrical nerve stimulation (TENS) units "work by delivering small electrical impulses through electrodes that have adhesive pads to attach them to a person's skin." https://www.medicalnewstoday.com/articles/323632.

1  subjective complaints; diagnosed chronic pain syndrome, osteoarthritis of the right

2  acromioclavicular joint, and bilateral shoulder tendinitis; prescribed medications, a TENS unit,

3  and acupuncture; and opined that she was "permanently disable[d]."  AR 1487-89.  Although Dr.

4  Callao deemed Plaintiff's osteoarthritis "[n]on operable," she also noted that the diagnoses were

5  stable.  AR 1490.

6       Records dated March 2018 document that Plaintiff complained she was in "constant" pain;

7  a diagnosis of "Chronic Pain Syndrome," requiring Plaintiff to move positions every five minutes

8  and which grew "worse with any elevation" and caused "poor" sleep; that medications make her

9  "fatigued and dizzy"; that she is "permanently disabled"; that she has experienced "minimal pain

10  relief" with treatment; and continued diagnoses of osteoarthritis of the right acromioclavicular

11  joint, which was determined to be non-operable, and tendinitis of the bilateral shoulders.  AR

12  1487-90; 1695-98.

13       In April 2018 Plaintiff had a medication follow-up visit with Dr. Daher.  AR 1882-87.  She

14  stated that she was doing well; medications helped her concentrate; she was able to finish artwork;

15  sleep, appetite, and mood were good; she had her own business—an art studio and website; and

16  she denied side effects.  AR 1882-83.  She had no depression or anxiety, no dizziness or chest

17  pain, no irritability, no palpitations or headaches, and no mania.  AR 1883.  Her treatment

18  response was good, and she reported exercising and doing artwork.  *Id.*  Her mental status

19  evaluation was normal.  AR 1884.  Dr. Daher diagnosed ADHD, inattentive type, and noted that

20  Plaintiff was doing well on Adderall.  AR 1886.

21       The next day, Dr. Kataria noted that acupuncture, physical therapy, and TENS had been

22  effective in reducing Plaintiff's pain.  AR 1427, 1706.  Based on physical examination and

23  diagnostic imaging, Dr. Kataria could not medically justify putting Plaintiff off work.  AR 1429-

24  31, 1708-10.

25       ## 2.    Physical Medical Source Statement

26       Dr. Callao provided a Medical Source Statement dated March 28, 2018.  AR 1301-04.  She

27  noted her first contact with Plaintiff was in July 2013 and she had examined her every three

28  months.  AR 1301.  Dr. Callao diagnosed Plaintiff with chronic pain syndrome, tendonitis of the

United States District Court
Northern District of California

United States District Court
Northern District of California

1   right shoulder, and degenerative joint disease of the right shoulder, all of which caused symptoms

2   of "constant" "moderate to severe pain [in the] neck and shoulders with minimal movement [and]

3   fatigue and dizziness due to medications," as documented by tender points of the neck and

4   shoulders and the muscles of the neck and thoracic spine.  *Id.*  She described Plaintiff's treatments

5   as physical therapy, acupuncture, medication injections and TENS units, noting that her oral

6   prescriptions cause dizziness and fatigue.  *Id.*

7          Dr. Callao determined that in a "competitive work situation," Plaintiff's impairments

8   would limit her to walking less than one city block without rest or severe pain (AR 1301); sitting

9   for 15 minutes at one time, standing for 15 minutes at one time, and sitting, standing or walking

10  less than 2 hours in an 8-hour work day with a need for "shifting positions at will from sitting,

11  standing or walking" and periods of "walking around" every 15 minutes for a total of 10 minutes

12  each time (AR 1302); that she would require unscheduled breaks during a work day every 15

13  minutes for 10 minutes at a time due to "muscle weakness; chronic fatigue; pain/paresthesias;

14  numbness; adverse effects of medication" (*id.*); and that she could "never" lift and carry even less

15  than 10 pounds, "never" twist, stoop, crouch/squat, climb stairs or climb ladders (AR 1303).  Dr.

16  Callao also determined Plaintiff could not use her right and left hands for grasping, turning and

17  twisting objects; could not use her right and left fingers for fine manipulation; could not use her

18  right and left arms for reaching in front of the body; and could not use her arms for overhead

19  reaching.  *Id.*

20         Dr. Callao opined that Plaintiff's symptoms would be severe enough to interfere with

21  "attention and concentration" needed to be perform "simple work tasks," rendering her "off task"

22  for 25% or more of the work day; that she was incapable of "low stress work" due to pain and

23  medication side effects; and that she would be absent from work due to her impairments more than

24  four days per month.  *Id.*

25         **3.     Non-Examining State Agency Reviewer Opinions**

26         On September 22, 2016, state agency reviewer F. Wilson, M.D. determined Plaintiff could

27  perform light work, but she was restricted to limited exposure to extreme cold and hazards;

28  occasional overhead reaching with the left upper extremity; no more than frequent reaching in

8

other directions with the bilateral upper extremities; occasional climbing of ladders, ropes and scaffolds; occasional kneeling and crawling, and no more than frequent balancing.  AR 71-73.  On December 8, 2020, state agency reviewer R. Fast, M.D. also determined Plaintiff could perform light work, but she was restricted to limited exposure to extreme cold and hazards; occasional overhead reaching with the left upper extremity; no more than frequent reaching in other directions with the bilateral upper extremities; occasional climbing of ladders, ropes and scaffolds; occasional kneeling and crawling; and no more than frequent balancing.  AR 84-86.

### III.   SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

On July 26, 2016, Plaintiff filed a claim for Disability Insurance Benefits, alleging disability beginning on October 18, 2015.  AR 167-70.  On October 3, 2016, the agency denied Plaintiff's claim, finding she did not qualify for disability benefits.  AR 76.  Plaintiff subsequently filed a request for reconsideration, which was denied on December 9, 2016.  AR 89-93.  On June 26, 2017, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 103-04.  ALJ Jane Maccione conducted a hearing on June 13, 2018.  AR 36-63.  Plaintiff testified in person at the hearing and was represented by counsel, Sloan Witt.  The ALJ also heard testimony from Vocational Expert Stephen Schmidt.

### A.   Plaintiff's Testimony

Plaintiff testified she is in chronic pain in her shoulder blades and spine.  AR 47.  She is also unable to lift or hold anything with her hands.  *Id.*  She has arthritis in both shoulders and has pain in the "wing" of her shoulder blades which constantly radiates into the arms, into her fingers and into the muscles.  AR 48.  She tried acupuncture treatments, but her insurance ran out and she was unable to continue.  AR 49.  She also used a TENS unit on her back three times a day for approximately one hour and does physical therapy for pain in her "wings" and her shoulders.  *Id.*

Plaintiff takes pills that make her "really sleepy and groggy and it's very strong medicine." *Id.*  She is unable to drive when she takes the medication because she gets sleepy and dizzy.  AR 50.  The pills make her "unconscious" and she tries to avoid taking them "because otherwise I just stay in bed all the time and it's uncomfortable for when I wake up, my body is sore."  *Id.*  She only takes the pills when her pain is "extreme" because of the side effects.  *Id.*

United States District Court
Northern District of California

1    Plaintiff has problems getting dressed because she is unable to lift her arms up high.  AR

2    50-51.  Her daughter or husband must help her get dressed because "it seems like my shoulder is

3    in the wrong place."  AR 51.  She has pain when she makes a "T" with her elbow up at shoulder

4    height and she does not reach overhead.  *Id.*  She is only able to reach in front "a little."  AR 51-

5    52.  Plaintiff also has problems grooming herself, so her daughter must wash her hair and help her

6    make a hair bun.  AR 52.

7    Plaintiff is sometimes able to do the shopping, although it's mostly her daughter or

8    husband that does it.  *Id.*  Her family hired a cleaning person to come once a month, so she does

9    not do the cleaning.  *Id.*

10    Plaintiff does not engage in hobbies because "I'm having a really hard time to focus when

11    – during the day with the pills and all that things that happen with me."  AR 53.  She forgets things

12    like remembering to drink water and take pills.  *Id.*  She was prescribed Adderall for ADHD,

13    which she had to take for the hearing to focus and "stay still."  *Id.*  She does not take Adderall all

14    the time because it does not let her "relax and sleep."  *Id.*

15    Plaintiff is unable to sit for more than 20 minutes before she starts to feel pain in the low

16    spine, so she has to keep moving and changing her position.  AR 55.  She is not able to lift and

17    carry much weight.  AR 56.  For instance, she will drop a cup of water or a plate from her hands

18    due to pain in the muscle and nerves.  *Id.*  She testified that her "hand does not obey me;" and that

19    her husband must carry her purse.  *Id.*

20    Plaintiff does not sleep more than six hours a night and her sleep is interrupted because she

21    has to keep moving in bed.  *Id.*  She wakes up feeling tired.  *Id.*  She lies down for 25 minutes

22    three times a day.  AR 57.  At least once a week "I have to just take all the pills and just stay in

23    bed all day."  *Id.*  The constant pain keeps her from working and it makes her depressed and

24    feeling useless.  *Id.*

25    The last time Plaintiff worked was in April 2015 as a nanny for twin children.  She worked

26    "12 hours, 13 hours every day," "doing everything for the children," i.e., "bathing and cleaning

27    and dressing and feeding them, and playing with them and taking them places," "teaching them,"

28    and "[d]riving them to places where they need[ed] to go," including swimming class, where she

1   "sw[a]m with the babies."  AR 40-42.

2   **B.      Vocational Expert's Testimony**

3           The ALJ asked the vocational expert a series of hypotheticals.  In the first, she asked the

4   expert to assume an individual of Plaintiff's age, education and vocational background with the

5   following limitations:

6               At a light range of exertion; frequent climbing or ramps and stairs;
                occasional climbing of ladders; no climbing of ropes or scaffolds;
7               limited to . . . frequent balancing, stooping, kneeling and crouching,
                [and] . . . no crawling[.]
8
9               Limited to no reaching overhead with the left upper extremity.  No
                lateral reaching with the bilateral upper extremities; limited to
10              frequent reaching in a forward direction bilaterally; must avoid
                concentrated exposure to extremes of cold; must avoid concentrated
11              exposure to workplace hazards[.]

12  AR 58-59.  When asked if the individual could perform Plaintiff's past work, the expert replied

13  they could not.  AR 59.  The expert testified that "no lateral reaching at all is very restrictive in

14  unskilled positions and I believe with the combination of all the factors . . . that's too confining to

15  be able to fit within competitive work."  *Id.*

16          In the second hypothetical, the ALJ asked the expert to assume the same individual

17              At the light exertional level; again, with frequent climbing of ramps
                and stairs; let's say no climbing of ropes, ladders or scaffolds;
18              frequent balancing, stooping, crouching and kneeling; no crawling.
                This individual is limited to no reaching overhead bilaterally and
19              frequent reaching in all other directions; must avoid concentrated
                exposure to extremes of cold; must be protected from exposure to
20              workplace hazards, such as unprotected heights and dangerous
                moving mechanical parts[.]
21
22  AR 59-60.  When asked if the individual could perform Plaintiff's past work, the expert replied

23  they could not.  AR 60.  The expert responded that the individual could perform work as a cashier

24  (Dictionary of Occupation Titles ("DOT")[3]  211.462-010, Specific Vocational Preparation

25  _____

26  [3] The Dictionary of Occupational Titles by the United States Department of Labor, Employment &
    Training Administration, may be relied upon "in evaluating whether the claimant is able to
27  perform work in the national economy."  *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990).
    The DOT classifies jobs by their exertional and skill requirements and may be a primary source of
28  information for the ALJ or Commissioner.  20 C.F.R. § 404.1566(d) (1).  The "best source for how
    a job is generally performed is usually the Dictionary of Occupational Titles."  *Pinto v.*

United States District Court
Northern District of California

("SVP")[4] level 2), information clerk (DOT 237.367-018, SVP 2), and electronics worker (DOT 726.687-010, SVP 2).  *Id.*  The expert noted the DOT does not address the issue of different directions of reaching and that he was basing his answers on his experience.  *Id.*

In the third hypothetical, the ALJ asked the expert to assume the same individual with the same restrictions as the second hypothetical, but that would require a stretch break once per hour for five minutes.  The expert testified that individual could not perform work in the national economy because "if you cannot follow a competitive work schedule, being able to work at least two hours consistently, you're not a competitive employee."  AR 60-61.

Finally, the ALJ asked if any of the previous hypothetical individuals would be able to maintain competitive employment if they were to be off task greater than 10% of the time.  AR 61.  The expert stated they could not.  *Id.*

## C.   ALJ's Decision and Plaintiff's Appeal

On September 13, 2018, the ALJ issued an unfavorable decision finding Plaintiff was not disabled.  AR 19-30.  This decision became final when the Appeals Council declined to review it on May 29, 2019.  AR 8-13.  Having exhausted all administrative remedies, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).  On March 3, 2020, Plaintiff filed the present Motion for Summary Judgment.  On March 31, 2020, Defendant filed a Cross-Motion for Summary Judgment.

## IV.   STANDARD OF REVIEW

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g).  An ALJ's decision to deny benefits must be set aside only when it is "based on legal error or not supported by substantial evidence in the record."  *Trevizo v. Berryhill*, 871 F.3d 664, 674 (9th Cir. 2017) (citation and quotation marks omitted).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek*

---

*Massanari*, 249 F.3d 840, 846 (9th Cir. 2001).

[4] "The DOT lists an SVP time for each described occupation.  Using the skill level definitions in 20 C.F.R §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  Social Security Ruling 00-4p.

United States District Court
Northern District of California

1    *v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation and quotation marks omitted).  It requires

2    "more than a mere scintilla" but "less than a preponderance" of the evidence.  *Id.*; *Trevizo*, 871

3    F.3d at 674.

4            The court "must consider the entire record as a whole, weighing both the evidence that

5    supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm

6    simply by isolating a specific quantum of supporting evidence."  *Trevizo*, 871 F.3d at 675 (citation

7    and quotation marks omitted).  However, "[w]here evidence is susceptible to more than one

8    rational interpretation, the ALJ's decision should be upheld."  *Id.* (citation and quotation marks

9    omitted).  "The ALJ is responsible for determining credibility, resolving conflicts in medical

10   testimony, and for resolving ambiguities."  *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014)

11   (citation and quotation marks omitted).

12          Additionally, the harmless error rule applies where substantial evidence otherwise supports

13   the ALJ's decision.  *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012).  "[A]n error is

14   harmless so long as there remains substantial evidence supporting the ALJ's decision and the error

15   does not negate the validity of the ALJ's ultimate conclusion."  *Id.* (citation and quotation marks

16   omitted).  A court may not reverse an ALJ's decision because of a harmless error.  *Id.* at 1111

17   (citation omitted).  "[T]he burden of showing that an error is harmful normally falls upon the party

18   attacking the agency's determination."  *Id.* (citation and quotation marks omitted).

19                                        **V.    DISCUSSION**

20   **A.    Framework for Determining Whether a Claimant Is Disabled**

21          A claimant is considered "disabled"[5] under the Social Security Act if two requirements are

22   met.  *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  First, the

23   claimant must demonstrate "an inability to engage in any substantial gainful activity by reason of

24   any medically determinable physical or mental impairment which can be expected to result in

25   death or which has lasted or can be expected to last for a continuous period of not less than 12

26

27   _____

28   [5] Disability is "the inability to engage in any substantial gainful activity" because of a medical
     impairment which can result in death or "which has lasted or can be expected to last for a
     continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

United States District Court
Northern District of California

months." 42 U.S.C. § 423(d)(1)(A).  Second, the impairment or impairments must be severe enough that the claimant is unable to perform previous work and cannot, based on age, education, and work experience "engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

The regulations promulgated by the Commissioner of Social Security provide for a five-step sequential analysis to determine whether a Social Security claimant is disabled.  20 C.F.R. § 404.1520.  The claimant bears the burden of proof at steps one through four.  *Ford v. Saul*, 950 F.3d 1141, 1148 (9th Cir. 2020) (citation omitted).

At step one, the ALJ must determine if the claimant is presently engaged in a "substantial gainful activity," 20 C.F.R. § 404.1520(a)(4)(i), defined as "'work done for pay or profit that involves significant mental or physical activities.'"  *Ford*, 950 F.3d at 1148 (internal quotations and citation omitted).  Here, the ALJ determined Plaintiff had not performed substantial gainful activity since October 18, 2015.  AR 24.

At step two, the ALJ decides whether the claimant's impairment or combination of impairments is "severe," 20 C.F.R. § 404.1520(a)(4)(ii), "meaning that it significantly limits the claimant's 'physical or mental ability to do basic work activities.'"  *Ford*, 950 F.3d at 1148 (quoting 20 C.F.R. § 404.1522(a)).  If no severe impairment is found, the claimant is not disabled. 20 C.F.R. § 404.1520(c).  Here, the ALJ determined Plaintiff had the following severe impairments: arthritis of the right acromioclavicular joint, tendonitis of the bilateral shoulders, myofascial pain syndrome, and chronic pain syndrome.  AR 24.

At step three, the ALJ evaluates whether the claimant has an impairment or combination of impairments that meets or equals an impairment in the "Listing of Impairments" (referred to as the "listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404 Subpt. P, App. 1.  The listings describe impairments that are considered "to be severe enough to prevent an individual from doing any gainful activity."  *Id.* § 404.1525(a).  Each impairment is described in terms of "the objective medical and other findings needed to satisfy the criteria of that listing."  *Id.* § 404.1525(c)(3). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how

United States District Court
Northern District of California

severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (footnote omitted).  If a claimant's impairment either meets the listed criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, he is conclusively presumed to be disabled, without considering age, education and work experience.  20 C.F.R. § 404.1520(d).  Here, the ALJ determined Plaintiff did not have an impairment or combination of impairments that meets the listings.  AR 25.

If the claimant does not meet or equal a listing, the ALJ proceeds to step four and assesses the claimant's residual functional capacity ("RFC"), defined as the most the claimant can still do despite their imitations (20 C.F.R. § 404.1545(a)(1)), and determines whether they are able to perform past relevant work, defined as "work that [the claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it."  20 C.F.R. § 404.1560(b)(1).  If the ALJ determines, based on the RFC, that the claimant can perform past relevant work, the claimant is not disabled.  *Id.* § 404.1520(f).  Here, the ALJ determined Plaintiff has the RFC to

> perform light work as defined in 20 CFR 404.1567(b), but she is limited to frequent balancing, stooping, crouching, and kneeling; she cannot crawl. She cannot reach overhead, bilaterally. She is limited to no more than frequent reaching in all other directions bilaterally. She must avoid concentrated exposure to extremes of cold. She must be protected from concentrated exposure to workplace hazards, such as unprotected heights and dangerous moving mechanical parts.

AR 25.  Based on this RFC, the ALJ determined Plaintiff could not perform past relevant work. AR 28.

At step five, the burden shifts to the agency to prove that "'the claimant can perform a significant number of other jobs in the national economy.'"  *Ford*, 950 F.3d at 1149 (quoting *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002).  To meet this burden, the ALJ may rely on the Medical-Vocational Guidelines found at 20 C.F.R. Pt. 404 Subpt. P, App. 2,[6] or on the

---

[6] The Medical-Vocational Guidelines "relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy."  *Heckler v. Campbell*, 461 U.S. 458, 461(1983).  The Guidelines "consist of a matrix of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy."  *Id.* at 461-62 (footnotes omitted). The guidelines are commonly known as "the grids".  *Lounsbury v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006).

United States District Court
Northern District of California

testimony of a vocational expert.  *Ford*, 950 F.3d at 1149 (citation omitted).  "[A] vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy."  20 C.F.R. § 404.1560(b)(2).  An ALJ may also use "other resources, such as the DOT.  *Id.*  Here, the ALJ determined Plaintiff could perform work as a cashier (DOT 211.462-010, light, SVP 2), information clerk (DOT 237.367-018, light, SVP 2), and electronics worker (DOT 726.687-010, light, SVP 2).

**B.     Plaintiff's Arguments**

Plaintiff raises two arguments: (1) the ALJ committed harmful error by affording significant weight to the RFC assessments of non-examining state agency reviewers over the detailed and specific RFC assessment of long-term, treating physician, Dr. Callao, absent the requisite specific and legitimate reasons; and (2) the ALJ committed harmful error by failing to provide clear and convincing reasons for rejecting her pain symptomology.

**C.     Medical Opinions**

The ALJ gave Dr. Callao's opinion "little weight," finding it was internally inconsistent with her own treatment notes and understated Plaintiff's physical capacity.  AR 27.  The ALJ determined Dr. Callao's treatment notes did not document serious positive findings or signs that support the extreme limitations she recommended.  *Id.*  She found the opinion to be contradicted by recent diagnostic images of Plaintiff's shoulders, which showed only mild findings on the right side and no significant abnormalities on the left side.  AR 27-28.  The ALJ also found Dr. Callao's opinion inconsistent with "the general effectiveness" of acupuncture, physical therapy, and TENS unit stimulation.  AR 28.  The ALJ stated the opinion "provides no apparent basis for the limitations in sitting, standing, and walking as well as the need to change positions at will, take unscheduled breaks, and have numerous absences."  *Id.*

Plaintiff argues the ALJ "harmfully errs by cherry picking evidence out of context; failing to consider the record as a whole; 'playing doctor' by substituting the ALJ's lay judgement in

16

place of the treating physician's judgment; and manufacturing a conflict as to the outcome of treatment."  Pl.'s Mot. at 8-9.

### 1.    Legal Standard[7]

When determining whether a claimant is disabled, the ALJ must consider each medical opinion in the record together with the rest of the relevant evidence.  20 C.F.R. § 416.927(b), (c).  In deciding how much weight to give to any medical opinion, the ALJ considers the extent to which the medical source presents relevant evidence to support the opinion.  *Id.* § 416.927(c)(3).  Generally, more weight will be given to an opinion that is supported by medical signs and laboratory findings, and the degree to which the opinion provides supporting explanations and is consistent with the record as a whole.  *Id.* § 416.927(c)(3)-(4).

In conjunction with the relevant regulations, the Ninth Circuit "developed standards that guide [the] analysis of an ALJ's weighing of medical evidence."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527).  Courts "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  "By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians."  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(c)(2)).

If a claimant has a treatment relationship with a provider, and clinical evidence supports that provider's opinion and is consistent with the record, the provider will be given controlling weight.  20 C.F.R. § 416.927(c)(2).  "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'"  *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999)

---

[7] Rules regarding the evaluation of medical opinion evidence were recently updated, but the updates were made effective only for claims filed on or after March 27, 2017.  *See* 82 Fed. Reg. 5844 (Jan. 18, 2017).  As Plaintiff's claim was filed before 2017, the Court evaluates the medical opinion evidence in his case under the older framework as set forth in 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) and in Social Security Ruling 96-2p.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). "If a treating physician's

2   opinion is not given 'controlling weight' because it is not 'well-supported' or because it is

3   inconsistent with other substantial evidence in the record, the [SSA] considers specified factors in

4   determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the

5   '[l]ength of the treatment relationship and the frequency of examination' by the treating physician;

6   and the 'nature and extent of the treatment relationship' between the patient and the treating

7   physician." *Id.* (citing 20 C.F.R. § 404.1527(c)(2)(i)-(ii)).

> Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and '[o]ther factors' such as the degree of understanding a physician has of the [Social Security] Administration's 'disability programs and their evidentiary requirements' and the degree of his or her familiarity with other information in the case record.

13   *Id.* (citing 20 C.F.R. § 404.1527(c)(3)-(6)). Nonetheless, even if the treating physician's opinion

14   is not entitled to controlling weight, it is still entitled to deference. *See Orn*, 495 F.3d at 632

15   (citing SSR 96–2p,[8] 1996 WL 374188 (July 2, 1996)). "In many cases, a treating source's medical

16   opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the

17   test for controlling weight." SSR 96-2p at 4.

18       Where an examining doctor's opinion is contradicted by another opinion, an ALJ may

19   reject it by providing specific and legitimate reasons that are supported by substantial evidence.

20   *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

21       **2.    Analysis**

22       The Court finds the ALJ's explanation for discounting Dr. Callao's opinions is conclusory

23   and does not meet the "specific and legitimate reasons supported by substantial evidence"

24   standard. As a preliminary matter, in according Dr. Callao's opinion "little weight," the ALJ does

---

[8] "[Social Security Rulings] do not carry the force of law, but they are binding on ALJs nonetheless." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see* 20 C.F.R. § 402.35(b)(1). The Ninth Circuit defers to the rulings unless they are "plainly erroneous or inconsistent with the Act or regulations." *Chavez v. Dep't. of Health and Human Serv.*, 103 F.3d 849, 851 (9th Cir. 1996).

not appear to have applied all the factors set forth in 20 C.F.R. § 404.1527(c).  Those regulations "provide that, when a treating source's opinions are not given controlling weight, an ALJ must apply the factors in 20 C.F.R. § 404.1527(c)(2)(i-ii) and (c)(3-6) in determining how much weight to give each opinion."  *Garrison*, 759 F.3d at 1012 n.11.  These factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, and specialization.  An ALJ is required to analyze these factors "because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'"  *Id.* at 1012 (quoting *Orn*, 495 F.3d at 633).

Dr. Callao has treated Plaintiff since July 2013 and has examined her every three months subsequently.  AR 1301-04.  She diagnosed chronic pain syndrome; tendonitis of the right shoulder; and degenerative joint disease of the right shoulder all of which caused symptoms of "constant" "moderate to severe pain [in the] neck and shoulders with minimal movement [and] fatigue and dizziness due to medications," as documented by tender points of the neck and shoulders and the muscles of the neck and thoracic spine.  AR 1301.  Dr. Callao described Plaintiff's treatments as physical therapy, acupuncture, medication injections and TENS units, noting that her oral prescriptions cause dizziness and fatigue.  *Id.*  She determined that in a "competitive work situation" Plaintiff's impairments would limit her as follows: walking less than one city block without rest or severe pain; sitting for 15 minutes at one time; standing for 15 minutes at one time; sitting, standing or walking less than 2 hours in an 8-hour work day with a need for "shifting positions at will from sitting, standing or walking" and periods of "walking around" every 15 minutes, for a total of 10 minutes each time; that she would require unscheduled breaks during a work day, every 15 minutes, for 10 minutes at a time due to "muscle weakness; chronic fatigue; pain/paresthesias; numbness; and adverse effects of medication"; that she could "never" lift and carry even less than 10 pounds, "never" twist, stoop, crouch/squat, climb stairs or climb ladders; that she is not able to use her right and left hands for grasping, turning and twisting objects; to use her right and left fingers for fine manipulation; to use her right and left arms for reaching in front of the body; and arms for overhead reaching; that her symptoms would be severe

19

enough to interfere with "attention and concentration" needed to be perform "simple work tasks," rendering her "off task" for 25% or more of the work day; that she is incapable of "low stress work" due to pain and medication side effects; and that she would be absent from work due to her impairments more than 4 days per month. AR 1301-03. Given the length of the treatment relationship, the frequency of examination, and the consistency of Dr. Callao's treatment records, the factors in 20 C.F.R. § 404.1527(c)(2)(i-ii) and (c)(3-6) appear to weigh in favor of giving her opinion the greatest weight.

Further, Dr. Callao's opinion is well supported by the substantial evidence of record. Treatment records from Kaiser dated October 2015 through August 2016 document Plaintiff's chronic and recurrent pain in her elbow, neck, scapula and knee (AR 293, 304); treatment for ADHD, inattentive type with Adderall (AR 273; 303; 370; 407; 413); diagnosis of osteoarthritis of right acromioclavicular joint, severe distal supraspinatus and infraspinatus tendinosis and hypoplastic bicipital groove per 2013 MRI (AR 298-300; 417); and an April 2015 addendum to the right shoulder MRI documenting "mild widening of the right acromioclavicular joint with decreased cortical definition of the distal clavicle. This is commonly secondary to chronic repetitive overuse injury" (AR 416); with continued diagnoses of chronic pain syndrome, myofascial pain syndrome, fibromyalgia and myalgia (AR 283-84).

Physical therapy records dated November 2015 through July 2016 document continued PT and acupuncture for "major pain below scapula . . . any weight lifting causes pain" (AR 264-65; 276; 280-81; 298; 291-93); right hand pain (AR 289); right sided neck, upper back pain; hand/thumb/arm pain that extends to elbow; and low back pain that refers down to the knee (e.g., AR 264-65; 276; 281-82; 285-86).

Treatment records from Dr. Callao at Kaiser dated November 2015 document diagnoses of chronic neck pain and osteoarthritis of the right acromioclavicular joint. AR 417, 420. February 2016 treatment records document continued diagnoses of chronic pain syndrome, myofascial pain syndrome; fibromyalgia; and myalgia and that Plaintiff was suffering from "intermittent memory lapses;" that she was "not sleeping well due to pain;" and that "Etodolac works partially." AR 283-84. Records dated April 2016 through July 2016 document continued diagnoses of chronic

20

1  pain syndrome; myofascial pain syndrome and fatigue.  AR 643; 742; 1153.  Treatment records

2  dated February 2017 document that Plaintiff was "in so much pain, taking pills for pain but

3  nothing is helping" and that she was diagnosed with Adjustment Disorder with Depressed Mood

4  and prescribed Flexeril (Prozac).  AR 1438-42, 1523.  Treatment records dated March 2018

5  document treatment for "constant" "moderate to severe" joint pain, with continuing diagnosis of

6  "Chronic Pain Syndrome," requiring her to move positions every 5 minutes, "worse with any

7  elevation," causing "poor" sleep; that medications make her "fatigued and dizzy;" that she is

8  "permanently disabled;" that she has experienced "minimal pain relief" with treatment; and

9  continued diagnoses of osteoarthritis of the right acromioclavicular joint, which was determined to

10  be non-operable, and tendinitis of the bilateral shoulders.  AR 1487-90; 1695-98.

11       Kaiser treatment records from Dr. Singh dated April 2016 document continued diagnosis

12  of "chronic pain related to MFS and fibromyalgia;" that her pain was "sharp, throbbing and gets

13  worse with activity or movements and interferences in daily life;" that she "tried conservative

14  measures without any benefit; and that medications prescribed were Mobic, Baclofen, and

15  Gabapentin.  AR 277-78; 1315.

16       Physical therapy records dated June 2016 through October 2016 document that Plaintiff

17  was enrolled in "Level 2 Chronic Pain" classes and "Essential Skills" classes in order to address

18  her problematic sleeping issues due to pain; "flare (pain) management" classes, with continued

19  diagnoses of chronic pain with examination findings of decreased range of motion, decreased

20  strength and pain "causing an impaired functional ability with overhead movement."  AR 257;

21  766; 1041, 1120, 1152; 1179; 1206; 1257.  Records dated October 2016 through November 2016

22  document that Plaintiff's pain was "worse" with pain in her shoulders at the neck and down her

23  shoulder blades with examination findings of 50% reduction of range of motion, with painful

24  flexion and slouch posture.  AR 1258; 1296; 1501.  Records dated October 2016 through

25  November 2016 document worsening pain with "shift in the weather" with the return of

26  headaches, stiff neck, painful raising of arms and that she is undergoing neck traction.  AR 1380;

27  1501.

28       An October 2016 Chronic Pain Management Pharmacist Initial Note documents

United States District Court
Northern District of California

generalized all over pain likely secondary to myofascial pain located in her shoulder blades, right shoulder and upper back; with pain described as "sharp, constant, feels like stuff tight muscle;" "the pain increases with lifting, extending sitting, extended time in same position; with the "average severity" pain level of a 7/10 with her least pain at 5/10; and that she was prescribed Indomethacin, Baclofen, Meloxicam and Gabapentin.  AR 1288-89.  A November 2016 record documents that Plaintiff was only able to walk for about 15 minutes at one time and to sit at a computer for 15 minutes; that she was experiencing poor sleep, with average pain as a 6/10, with worsening pain as a 9/10; and that she develops pain if she does too much functional activity.  AR 1385-86; 1507.

Physical therapy records from the Chronic Pain Program dated December 2016 document Plaintiff's diagnosis of fibromyalgia, with noted "difficulty lifting and holding even light objects with her right upper extremity" with examination findings of tender anterior glenohumeral region with reduced strength testing in the right shoulder; and the conclusion that "the patient's right shoulder pain is/are causing an impaired functional ability to lift things."  AR 1390-92; 1511-13. Physical therapy records dated February 2018 document Plaintiff was referred again by Dr. Callao due to "chronic neck and shoulder pain," with "aggravating activities" noted as: "overhead activities, computer use and using arms [for] reaching and lifting;" with documented continued "poor" sleep and examination findings of tenderness at the "upper and low aspects of the C-spine as well as the upper traps and inter scap areas bilat;" and shoulder resistance tests revealing "bilateral shoulders pain full with manual testing."  AR 1421, 1683-84.

Kaiser Department of Pain Medicine records dated April 2018 from Dr. Kataria note "numbness in fingertips of left hand, distal to nails" with current medications as "Indomethacin (pain); Meloxicam; Methocarbamol (muscle spasms); Pantoprazole; Baclofen (muscle relaxant); Adderall; and Nortriptyline (pain)."  AR 1427-28.

The ALJ references the "general effectiveness of acupuncture, physical therapy, and transcutaneous nerve stimulation (Exhibits 1F/4 and 12F/210)" and "the claimant's ability to drive."  AR 27-28.  However, a review of Exhibit 1F/4 reveals Plaintiff's continued chronic pain diagnosis and documentation of her symptomology of "slouched" posture and also examination

United States District Court
Northern District of California

findings of "painful" flexion and "painful internal rotation; reduced gross strength assessment; decreased range of motion" with notation that "the pain is/are causing an impaired functional ability with the overhead movement."  AR 257.  Exhibit 12F/210 is a follow-up examination with one of several pain management physicians which documents: "improvement" with use of a TENS unit, a reference to acupuncture in the past with "good relief," but also documents new symptoms of numbness in the fingertips with subsequent notations of multiple continued prescriptions for nerve pain (Nortriptyline), Indomethacin and muscle spasm (Mobic).  AR 1706-07.  Even if these two records show some form of improvement with treatment, the ALJ fails to explain how they support her observation about the "general effectiveness" of Plaintiff's treatment when considered with the treating physician's opinion and the general evidence of record, as detailed above.

In short, rather than considering the record as a whole, the ALJ appears to have cherry-picked evidence out of context.  *See Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014) ((holding that an ALJ erred when he "improperly cherry-picked" the treating physician's "characterizations of [claimant's] rapport and demeanor instead of considering these factors in the context of [the treating physician's] diagnoses and observations of impairment."); *Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006) ("An ALJ cannot arbitrarily substitute his own judgment for competent medical opinion, . . . and he must not succumb to the temptation to play doctor and make [his] own independent medical findings.") (citations and internal quotations omitted); *Garrison*, 759 F.3d at 1013 (ALJ cannot "manufacture[] a conflict with respect to the outcome of treatment"); *Orn*, 495 F.3d at 630 ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'"); *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

Further, although the ALJ found Dr. Callao's treatment notes were "internally inconsistent with the doctor's own treatment notes," she did not identify any that were inconsistent.  This is the type of conclusory statement that the Ninth Circuit has repeatedly held insufficient.  *See Garrison*, 759 F.3d at 1012-13 ("In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a

substantive basis for his conclusion."); *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988) ("To say that medical opinions are not supported by sufficient objective findings . . . does not achieve the level of specificity our prior cases have required, even when the objective factors are listed seriatim."); *Beech v. Colvin*, 2014 WL 2931177, at *8 (C.D. Cal. June 26, 2014) (finding harmful error in an ALJ's "conclusory" rejection of a treating physician's medical source statement in the case of a claimant diagnosed with myofascial pain syndrome because the ALJ's rejection was "impermissibly conclusory and provides no specific reference to any inconsistencies between [the treating physician's] opinion and plaintiff's treatment records.  Rather, the ALJ merely states that [the treating physician's] 'opinion is inconsistent with [plaintiff's] medical records.'"); *Regennitter v. Comm'r of SSA*, 166 F.3d 1294, 1299 (9th Cir. 1999) (noting that "conclusory reasons will not justify an ALJ's rejection of a medical opinion"); *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989) (broad and vague reasons for rejecting the treating physician's opinion do not suffice).  The ALJ does refer to an April 2015 addendum to the right shoulder MRI, which documents "mild widening of the right acromioclavicular joint with decreased cortical definition of the distal clavicle.  This is commonly secondary to chronic repetitive overuse injury."  AR 337, 416.  However, objective imaging findings, which the ALJ does not address in her opinion, document Plaintiff's multiple diagnoses of osteoarthritis of right acromioclavicular joint, severe distal supraspinatus and infraspinatus tendinosis and hypoplastic bicipital groove.  AR 298-300, 417, 1487-90; 1695-98.  The ALJ fails to specify how any of these objective imaging findings are not serious or supportive of a finding of a less than sedentary limitation other than using lay knowledge to opine that these were "mild findings on the right side and no significant findings of the left side."  AR 27-28.

The ALJ also found that Dr. Callao's opinion is "inconsistent with the claimant's ability to drive."  AR 28.  However, she cites to an Exertional Questionnaire completed by Plaintiff in which she states she drives up to 45 miles before having pain and that she cannot drive after taking medication because it causes drowsiness.  AR 209-11.  The ALJ fails to discuss how Plaintiff's ability to drive up to 45 miles when she is not on medication equates to the agency-required ability to sustain work activity, eight hours a day, five days a week in normal work environment on a

consistent basis.  *See Trevizo*, 871 F.3d at 682 (holding that "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication. . ..  That appears to be the case here, where Trevizo's childcare responsibilities permit her to rest, take naps, and shower repeatedly throughout the day, all of which would be impossible at a traditional full-time job.") (citation and internal quotations omitted).  As the Ninth Circuit has explained:

> The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, *see, e.g., Howard v. Heckler*, 782 F.2d 1484, 1488 (9th Cir. 1986) (claim of pain-induced disability not gainsaid by capacity to engage in periodic restricted travel); *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (ordering award of benefits for constant back and leg pain despite claimant's ability to cook meals and wash dishes), and many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication.

*Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  The ALJ's reliance on Plaintiff's ability to drive when not on medication is not a specific and legitimate reason to discount the opinion of Dr. Callao.

In sum, the Court finds the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Callao's opinion, the decision must be reversed.

**D.     Credibility**

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms.  AR 26.  However, she found Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence . . .."  *Id.*  Specifically, she noted that Plaintiff was diagnosed with tendinosis of the bilateral shoulders in 2013, but she was able to continue working until April 2015.  *Id.*  The ALJ also noted that diagnostic images taken that month revealed only mild osteolysis in the right shoulder and no significant abnormalities in the left shoulder.  *Id.*  The ALJ also noted that treatment records reflect that acupuncture, physical therapy, and TENS unit treatment were effective in reducing pain, and that Dr. Kataria stated as late as April 2018 that, based on physical examination and diagnostic imaging, she could not

medically justify putting Plaintiff off work.  *Id.*  Finally, the ALJ noted that Plaintiff "showed no persuasive evidence of debilitating pain or discomfort while testifying at the hearing."  AR 27.

Plaintiff argues the ALJ "misstates the copious evidence of record documenting the sedating side-effects of [her] multiple medications for which she was required to sign a medication management agreement (e.g., AR 1291, 1487), that she credibly testified prevent her from driving or being functional at least one day per week when her pain reaches an 'extreme' level and she must take her medication, rendering her 'unconscious' and unable to leave her bed for most of the day."  Pl.'s Mot. at 17-18.  Plaintiff further argues the ALJ erred because she appeared to dismiss her pain testimony based on the ALJ's own lay observations at the hearing.  *Id.* at 18.

### 1.    Legal Standard

Congress expressly prohibits granting disability benefits based solely on a claimant's subjective complaints.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability"); 20 C.F.R. § 416.929(a) (an ALJ will consider all of a claimant's statements about symptoms, including pain, but statements about pain or other symptoms "will not alone establish" the claimant's disability).  "An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking, a result plainly contrary to [the Social Security Act]."  *Fair*, 885 F.2d at 603.  An ALJ is, however, required to make specific credibility findings.  *See* SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996) (the credibility finding "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight").

A two-step analysis is used when determining whether a claimant's testimony regarding their subjective pain or symptoms is credible.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  First, it must be determined "whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc); 42 U.S.C. § 423(d)(5)(A)).  A claimant does not need to "show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged;

1   she need only show that it could reasonably have caused some degree of the symptom."

2   *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)).

3          Second, if the claimant has met the first step and "there is no evidence of malingering, 'the

4   ALJ can reject the claimant's testimony about the severity of her symptoms only by offering

5   specific, clear and convincing reasons for doing so.'" *Id.* (quoting *Smolen*, 80 F.3d at 1281). "The

6   ALJ must state specifically which symptom testimony is not credible and what facts in the record

7   lead to that conclusion." *Smolen*, 80 F.3d at 1284. Courts must not engage in second-guessing,

8   where the ALJ "has made specific findings justifying a decision to disbelieve an allegation of

9   excess pain, and those findings are supported by substantial evidence in the record." *Fair*, 885

10   F.2d at 604. However, "a finding that the claimant lacks credibility cannot be premised wholly on

11   a lack of medical support for the severity of his pain." *Light v. Soc. Sec. Admin.*, 119 F.3d 789,

12   792 (9th Cir. 1997) (citing *Lester*, 81 F.3d at 834; *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir.

13   1986) (per curiam) ("'Excess pain' is, by definition, pain that is unsupported by objective medical

14   findings.").

15          Factors an ALJ may consider in weighing a claimant's credibility include: "[claimant's]

16   reputation for truthfulness, inconsistencies either in [claimant's] testimony or between [his]

17   testimony and [his] conduct, claimant's daily activities, [his] work record, and testimony from

18   physicians and third parties concerning the nature, severity, and effect of the symptoms of which

19   [claimant] complains." *Thomas*, 278 F.3d at 958-59 (quoting *Light*, 119 F.3d at 792). An ALJ's

20   credibility finding must be properly supported by the record, and sufficiently specific to ensure a

21   reviewing court he did not "arbitrarily discredit" a claimant's subjective testimony. *Id.* at 958

22   (citing *Bunnell*, 947 F.2d at 345-46).

23          **2.     Analysis**

24          The Court finds the ALJ failed to provide clear and convincing reasons to reject the

25   evidence of record that supports Plaintiff's claims of disabling pain and limitations that prevent

26   sustained work activity. First, as discussed above, Plaintiff's allegations are supported by

27   objective evidence that the ALJ failed to address in her decision.

28          Second, although the ALJ states she considered the side effects of Plaintiff's medication

1   and found "they are accommodated by the residual functional capacity determined herein," AR 27,

2   she does not address the evidence of record documenting the sedating side-effects of Plaintiff's

3   multiple medications for which she was required to sign a medication management agreement.

4   AR 1291, 1487.  Plaintiff testified that her medications prevent her from driving or being

5   functional at least one day per week when her pain reaches an "extreme" level and she must take

6   her medication, rendering her "unconscious" and unable to leave her bed for most of the day.  AR

7   50, 57.  The ALJ fails to explain how the RFC determination addresses these effects.  *See*

8   *Erickson v. Shalala*, 9 F.3d 813, 817-18 (9th Cir. 1993) (in determining a claimant's limitations,

9   the ALJ must consider all factors that might have a significant impact on an individual's ability to

10  work, including the side effects of medication and subjective evidence of pain); *Varney v. Sec'y of*

11  *Health & Human Servs.*, 846 F.2d 581, 585 (9th Cir.), *on reh'g*, 859 F.2d 1396 (9th Cir. 1988)

12  ("Also like pain, side effects can be a 'highly idiosyncratic phenomenon' and a claimant's

13  testimony as to their limiting effects should not be trivialized. . . . Therefore, if the Secretary

14  chooses to disregard a claimant's testimony as to the subjective limitations of side effects, he must

15  support that decision with specific findings similar to those required for excess pain testimony, as

16  long as the side effects are in fact associated with the claimant's medication(s).") (citation

17  omitted).

18          Third, the ALJ's decision is based in part on her own lay observations at the hearing:

19              The claimant showed no persuasive evidence of debilitating pain or
                discomfort while testifying at the hearing.  While the hearing was
20              short-lived and cannot be considered a conclusive indicator of the
                claimant's overall level of physical problems on a day-to day basis,
21              the apparent lack of serious physical difficulties during the hearing is
                someone inconsistent with the alleged severity of her systems.
22

23  AR 27.  However, as noted by the Ninth Circuit, such "sit and squirm" jurisprudence "has been

24  condemned."  *Perminter v. Heckler*, 765 F.2d 870, 872 (9th Cir. 1985) (citation omitted).  "Denial

25  of benefits cannot be based on the ALJ's observation of [a claimant], when [the claimant]'s

26  statements to the contrary . . . are supported by objective evidence," as is the case here.  *Id.* (citing

27  *Coats v. Heckler*, 733 F.2d 1338, 1341 (9th Cir. 1984).  The ALJ's observations during a "sit and

28  squirm" test cannot serve as a specific, clear, and convincing reason for rejecting Plaintiff's

testimony concerning the severity of her symptoms. *See id.*; *see also P.E. v. Saul*, 445 F. Supp. 3d 306, 333 (N.D. Cal. 2020) (improper for ALJ to rely on his own opinion based on observation of the claimant at the hearing when it contradicted the opinion of medical professionals).  Further, Plaintiff testified she had taken Adderall prior to the hearing in order to focus and "stay still" due to her general inability to focus and to remember simple things, that she does not take Adderall all the time because it does not let her "relax and sleep" due to her significant pain, and that she must take the sedating medication that renders her "unconscious," "sleepy" and "dizzy" in order to get pain relief rendering her unable to get out of bed at least one day per week.  AR 50; 53; 57.

Because the ALJ failed to provide clear and convincing reasons for rejecting Plaintiff's subjective complaints, the decision must be reversed.

**E.     Remedy**

The remaining question is whether to remand for further administrative proceedings or for the immediate payment of benefits under the credit-as-true doctrine.  "When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits."  *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)).  However, under the credit-as-true rule, the Court may order an immediate award of benefits if three conditions are met.  First, the Court asks, "whether the 'ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'"  *Id.* (quoting *Garrison*, 759 F.3d at 1020).  Second, the Court must "determine whether there are outstanding issues that must be resolved before a disability determination can be made, . . . and whether further administrative proceedings would be useful."  *Id.* (citations and internal quotation marks omitted).  Third, the Court then "credit[s] the discredited testimony as true for the purpose of determining whether, on the record taken as a whole, there is no doubt as to disability."  *Id.* (citing *Treichler*, 775 F.3d at 1101).

It is only "rare circumstances that result in a direct award of benefits" and "only when the record clearly contradicted an ALJ's conclusory findings and no substantial evidence within the record supported the reasons provided by the ALJ for denial of benefits."  *Id.* at 1047.  Further,

United States District Court
Northern District of California

United States District Court
Northern District of California

even when all three criteria are met, whether to make a direct award of benefits or remand for further proceedings is within the district court's discretion. *Id.* at 1045(citing *Treichler*, 775 F.3d at 1101).  While all three credit-as-true factors may be met, the record as a whole could still leave doubts as to whether the claimant is actually disabled. *Trevizo*, 871 F.3d at 683 n.11.  In such instances, remand for further development of the record is warranted. *Id.*

Here, the ALJ failed to fully and fairly develop the record when evaluating Plaintiff's disability claim, but it is not clear that the ALJ would be required to find Plaintiff disabled. Accordingly, remand for further proceedings is appropriate.

## VI.    CONCLUSION

For the reasons stated above, the Court **GRANTS P**laintiff's Motion for Summary Judgment, **DENIES** Defendant's Cross-Motion for Summary Judgment, and **REVERSES** the ALJ's decision.  This case is **REMANDED** for further administrative proceedings consistent with this order.  The Court shall enter a separate judgment, after which the Clerk of Court shall terminate the case.

**IT IS SO ORDERED.**

Dated: September 2, 2020

THOMAS S. HIXSON
United States Magistrate Judge

30